FILED
'4 CLF        --CLRC

Federal District Court of the District of Massachusetts
Springfield Division

**Rinaldo Del Gallo**, III,
Plaintiff,

v.

**Roger Parent**,
United State Postal Service Postmaster, Pittsfield Post Office

**Chief Anthony Riello**,
Chief, Pittsfield Police Department,
Defendant

Case No.: 06-30063-KPN

# Brief Of Rinaldo Del Gallo, III
# In Support Of
# Motion For Summary Judgment

# CONCISE STATEMENT OF THE MATERIAL FACTS OF RECORD AS TO WHICH THE MOVING PARTY CONTENDS THERE IS NO GENUINE ISSUE TO BE TRIED

Rinaldo Del Gallo, III, the plaintiff, was a candidate for Massachusetts Governor' Council, 8th District. Pl. Aff. at 1. He needed to obtain by May 2, 2006 one thousand certified signatures by Democrats or Unenrolled voters to be placed on the ballot. During that period of time, Mr. Del Gallo wanted to gather signatures in front of the Pittsfield Post Office, in an area between two doors, but not directly in front of the doors so as to obstruct traffic.[1] Pl. Aff. at 1. In fact, there is still a need for declaratory relief because Mr. Del Gallo would like to gather signatures for others (and maybe himself) this upcoming city election in 2007 (for city office) and would like to gather signatures for those running for public in 2008 as well as for initiatives and public policy questions. Pl. Aff. at 1.

During the spring of 2004, Mr. Del Gallo was collecting signatures in front of the Pittsfield Post Office for Governor's Council. Pl. Aff. at 2. The staff of the Pittsfield Post office called the Pittsfield Police. Mr. Del Gallo was arrested by the Pittsfield Police Department for refusing to cease and desist gathering signatures for political office in front of the Pittsfield Post Office. In 2006, Mr. Del Gallo met Pittsfield Postmaster Parent at his office in the Pittsfield Post Office and asked if he could gather signatures on postal property because of new developments in case law. Pl. Aff. at 2. Pittsfield Post Master Parent Affidavit at p.2 §4. Mr. Del Gallo advised Mr. Parent of *Initiative & Referendum Inst. v. United States Postal Serv.*, 417 F.3d 1299 (D.C. Cir. 2005), and said that it was it illegal for the United States Post Office to stop him from gathering signatures. Pl. Aff. at 2. Mr. Parent stated he would talk to his counsel, got back to Mr. Del Gallo, and told him that they were sticking by their policy of not allowing him to gather signatures on sidewalk of the Pittsfield Post Office. Pl. Aff. at 2. Parent Affidavit at p.2 §4. Mr. Del Gallo was denied permission to gather signatures by Pittsfield Postmaster Roger Parent, Parent Affidavit at p.2 §4, and was told he would be arrested if he did. Pl. Aff. at 2. The assurance that there would be no problems with the Pittsfield Postmaster lacking, Mr. Del Gallo sought assurances from the Pittsfield Police Department and the City of Solicitor that he

---

[1] The court must be advised that there appears to be a conflict of assertions of fact regarding the architectural features of the Pittsfield Postal Sidewalk. Accordingly, Mr. Del Gallo has not included a motion for summary judgment that the postal sidewalk is a *Grace* sidewalk based on the fact that it is *thoroughfare*. The government has filed an affidavit by the Pittsfield Postmaster indicating the sidewalk is only an *interior sidewalk*. Pittsfield Post Master Parent Affidavit at p.1 ¶2 (stating the attached diagram is accurate) and ¶4 ("The sidewalk . . . is not used as a thoroughfare"). Mr. Del Gallo maintains differently. See Del Gallo's "Affidavit of Topography of Pittsfield Post Office." Regrettably, this difference of asserted fact forecloses Mr. Del Gallo's ability to move for summary judgment based on the assertion that the postal sidewalk in question is a thoroughfare, and not merely an interior sidewalk, as in all the other postal sidewalk cases.

would not be arrested if he attempted to gather signatures on the Pittsfield Post Office sidewalk. Mr. Del Gallo informed Mr. Riello through messages left during visits to the Pittsfield Police Office, and also spoke to City Solicitor's office. Pl. Aff. at 2. Neither the Chief nor the City Solicitor would assure Mr. Del Gallo that he would not be arrested when he went to gather signatures at the Pittsfield Post Office. Pl. Aff. at 2.

On Monday, March 27, 2006, the Pittsfield Police stopped Rinaldo Del Gallo, III and Dion Robbins-Zust, who were gathering signatures by standing on the sidewalk on Fenn Street *owned by the City of Pittsfield.* Pl. Aff. at 3. The Pittsfield Police conferred with Roger Parent, and told Mr. Del Gallo that if he stepped foot on the property of the Pittsfield Post Office to gather signatures for office, we would be arrested again for trespass. Pl. Aff. at 3. *Of particular moment, Mr. Del Gallo then asked if he could ask people if they would sign his papers on postal property, but direct the would-be signers to the public sidewalk that was city property and did not belong to the Pittsfield Post Office.* Pl. Aff. at 3. After the police and postal staff conferred, Mr. Del Gallo was told that he could not ask people for signatures and direct them to Mr. Robbins-Zust who would gather signatures on the public sidewalk, but had to do everything on the city sidewalk. Pl. Aff. at 3. Cf. Parent Affidavit at p.2 §4 (Stating that permission was denied on "several occasions.")

There was selective enforcement of the postal regulation. Prior to Mr. Del Gallo's arrest, countless candidates for political office and ballot questions, or people gathering signatures for such candidates and questions, were allowed to gather signatures at the Pittsfield Post Office.[2] Pl. Aff. at 3. Not one of them was told they could not gather signatures; the practice went on for generations, and it never impeded the flow of pedestrian traffic into the United States Post Office. Pl. Aff. at 3. The United States Post Office has a regulation, 39 C.F.R. 232.1, which deals with conduct on postal property. Pl. Aff. at 3. It places content-based restriction on speech. It allows many categories of speech but proscribes other categories of speech, though it purports to be viewpoint neutral. Sections 39 C.F.R. 232.1(h), (i), and (o) are the three sections that deal directly with the regulation of speech activities. 39 C.F.R. 232.1(e) is also relevant because it pertains to disorderly conduct, and contains language that is overbroad and vague.

---

It is hoped that this simple verity nearly widely known to be true among the citizens of Pittsfield does not becomes the subject of dispute. The fact the Post Office was place for gathering signatures for generations, including the critical period for which the regulation banned signature gathering. *See, infra,* n.6.

2

39 C.F.R. 232.1(h)(1) pertains to speech activities that are proscribed *anywhere* located on postal property, and then provides exceptions. 39 C.F.R. 232.1(a)(2), provides that 39 C.F.R. 232.1(h)(1) is subject to a putative *Grace* sidewalk exception, though the rule is stated incorrectly because *Grace* spoke of sidewalks that were *functionally* indistinguishable from city sidewalks, not sidewalks that were *visibly* indistinguishable from city sidewalks. 39 C.F.R. 232.1(h)(3), describes activities that are banned *only in* "lobbies and other interior areas of postal building open to the public." By inference, such activities listed in 39 C.F.R. 232.1(h)(3) *are permitted on postal property so long as they are not in lobbies or interior areas, such as the sidewalk in front of the Post Office.* 39 C.F.R. 232.1(h)(4) provides that voter registration may take place on postal property. 39 C.F.R. 232.1(h)(5) outlaws the use of "tables, chairs, freestanding signs or posters, structures, or furniture of any type" for speech activities except for voter registration described in (h)(4). While Mr. Del Gallo did not want to use any of the aforementioned materials, the section is relevant in this litigation because it entails a permitted speech that by its very nature is more obtrusive than Mr. Del Gallo's, subjecting the regulation to equal protection attacks and further suggesting the regulation is unreasonable, even if it is a nonpublic forum.

The variety of speech permissible on the sidewalk of the Pittsfield Post Office is without limit. Under 39 C.F.R. 232(h)(1)(i), "Soliciting alms and contributions, campaigning for election to any public office, collecting private debts, soliciting and vending for commercial purposes (including, but not limited to, the vending of newspapers and other publications), displaying or distributing commercial advertising, collecting signatures on petitions, polls, or surveys" is completely permissible so long as it concerns "Commercial *or nonprofit activities* performed under contract with the Postal Service or pursuant to the provisions of the Randolph-Sheppard Act." (Emphasis added). The Randolph-Sheppard Act, 20 USC §107 et. Seq., is a federal law that gives a preference to blind people to operate vending facilities on public property. Presumably, if Mr. Del Gallo were blind and being paid, he could open up a delicatessen and coffee shop on postal property, complete with long lines and the clamor of commercial commerce. Under the act, "blind persons licensed under the provisions of this chapter shall be authorized to operate vending facilities on any Federal property." Obviously, if Mr. Del Gallo were blind, it would be *more* likely that he would cause an obstruction not *less* likely. Nonetheless, if Mr. Del Gallo were a blind, paid signature gatherer, or if he worked for a non-profit that had a contract with the Post Office, he would have full ability to gather signatures.

3

Under 39 C.F.R. 232(h)(1)(iii), "Soliciting alms and contributions, campaigning for election to any public office, collecting private debts, soliciting and vending for commercial purposes (including, but not limited to, the vending of newspapers and other publications), displaying or distributing commercial advertising, collecting signatures on petitions, polls, or surveys" *is completely permissible* so long as it pertains to "the solicitation of Postal Service and other Federal military and civilian personnel for contributions by recognized agencies as authorized by the *Manual on Fund Raising Within the Federal Service*." Put bluntly, "the good guys" that have received the imprimatur of government approval and are "recognized agencies" "as authorized by the Manual on Fund Raising Within the Federal Service" are allowed to engage in the activity that Mr. Del Gallo would like to engage in—case law has recognized this to be the acme of discrimination.

There is much speech that is permitted by simple dint *that it is not banned* under the postal regulation. Under 39 C.F.R. 232.1(h)(3), "Leafleting, distributing literature, picketing, and demonstrating by members of the public" are completely permissible on postal sidewalks and exterior areas of the post office. (They are merely illegal in the lobbies and interior areas.) One could have a full scale protest about any government policy on the sidewalks of the Pittsfield Post Office, so long as it does not create the type of disturbances described in 39 C.F.R. 232.1(e).[3] Under 39 C.F.R. 232.1(h)(3), "public assembly and public address" "when conducted *or sponsored* by the Postal Service" can be done *anywhere* on postal property. Under 39 C.F.R. 232.1(h)(3), "public assembly and public address" *even if not* "conducted *or sponsored* by the Postal Service" can be done on postal property so long as it is not done "in lobbies or other interior areas." Thus, so long as not to create the disturbance described in 39 C.F.R. 232.1(e), a full scale public address on saving the whales, stopping global warming, the war in Iraq, or the excesses of government regulation can be fully performed on postal property, even without the permission of the post office, so long as it is not in the lobby or other interior areas. One could engage in street theater, if not a full-scale Shakespearean production of Hamlet (so long as traffic was disrupted). Branding a Nazi uniform, one could pass out literature advocating genocide knowing that he will remain perfectly unmolested by the authorities. But if Mr. Del Gallo showed up to the same spot on the postal sidewalk donning a suit a tie, asking for a signature for office so that he could support the rights of

---

[3] 39 C.F.R. 232.1(e) reads, "Disturbances. Disorderly conduct, or conduct which creates loud and unusual noise, or which impedes ingress to or egress from post offices, or otherwise obstructs the usual use of entrances, foyers, corridors, offices, elevators, stairways, and parking lots, or which otherwise tends to impede or disturb the public employees in the performance of their duties, or which otherwise impedes or disturbs the general public in transacting business or obtaining the services provided on property, is prohibited."

4

minorities and promote racial equality, Mr. Del Gallo best to remember to bring bail money. Burning the American flag on the sidewalk of the Pittsfield Post Office sidewalk raises no violation of the regulation (or of law), but gathering signatures for a public policy question to better fund veterans services will get you arrested. "Pamphleteers might distribute embarrassing or disturbing handbills, and soapbox orators might shout caustic invectives at postal patrons as they walk past, yet those activities are not subject to a categorical prohibition." *United States v. Kokinda*, 497 U.S. 720, 761 (1990).

To prove the point that the postal property is opened to a wide array of speech, so long as 39 C.F.R. 232.1(e) was not violated, on postal property, one can come completely unannounced to the exterior areas of the Pittsfield Post Office, leading a menagerie of camels, elephants, dogs, horses and other circus animals (to show that circus animals are not mistreated), followed by a train of scantly clad women in pasties and G-Strings protesting opposition to a local strip club, followed by a person reciting rude and offensive limericks, followed by someone showing grotesque photos of dead soldiers to protest the war, followed by someone showing grotesque photos of aborted fetuses to protest abortion, following by the "*Cohen v. California*" choral girls doing the can-can wearing "F*** the Draft" T-shirts, followed by an obnoxious man passing out toy guns to children in a "Gun for Tots Program," bearing a placard saying, "Guns Don't Kill People, People Kill People," followed by members of a 39 C.F.R. 232.1 protest society who are all upset at the wide range of speech permitted on postal grounds. While there is a sort of tongue-in-cheek aspect to this seemingly absurd recitation of facts *makes no mistake about it*, this wild menagerie of speech by any number of actors in any number of ways *is completely permissible under current postal regulations*, the protestations of the government that they never "intended" to open the forum notwithstanding. Closing a forum to select few speakers but opening it the multitudes is galaxies away from opening the forum to a select few speakers and closing it the multitudes: the former is clearly a quasi-public forum, the other not.

Under 39 C.F.R. 232.1(h)(4), voter registration may be done *anywhere* on postal property open to the public, even with the assistance of chairs, tables, signs and lawn signs, 39 C.F.R. 232.1(h)(5), so long as there is permission from the "the postmaster or installation head." Apparently, under postal regulations, voter resignation constitutes a use worthy of protection. It presumably does not disrupt the function of the Post Office, even when it is done in the interior areas. But, so the Post Office asserts, gathering signatures for public office using the same number of people, the same table, the same chairs, and the same

5

location, would frustrate the very purpose of having a Post Office and constitute a "reasonable regulation." Significantly more

information is required for voter registration than ballot access.

## ISSUES PRESENTED

*ISSUE 1: Whether Mr. Del Gallo's activity of asking people to sign his signature sheet off of postal property on the city sidewalk falls within the Postal Regulation?* Page 6.

*ISSUE 2: Whether the applicable postal regulation is a content-based restriction or whether it is a content neutral time-place-manner restriction?* Page 7.

*ISSUE 3: Whether the sidewalk at the Pittsfield Post Office, if not a Grace sidewalk and thus a traditional public forum, is a quasi-public forum subject to strict scrutiny review because it has been opened to so many speakers, or a nonpublic forum subject to only a reasonableness review?* Page 8.

*ISSUE 4: Whether, assuming the sidewalk at the Pittsfield Post Office is a limited (quasi) public forum or traditional public forum, whether the regulation passes strict scrutiny?* Page 11.

*ISSUE 5: Whether, assuming arguendo, the sidewalk at the Pittsfield Post Office is a nonpublic forum, whether the regulation is reasonable?*

*ISSUE 6: Whether there is an equal protection violation?*

## THE ARGUMENT

**ISSUE 1:** Whether Mr. Del Gallo's activity of asking people to sign his signature sheet off of postal property on the city sidewalk

falls within the Postal Regulation?: *Asking a person to sign a petition for ballot access on postal property, wherein the*

*collecting and signing of the petition is off postal property and is on a city sidewalk, is not even proscribed by law or*

*regulation, and as to this behavior, summary judgment must be granted to Mr. Del Gallo both for damages and*

*declaratory relief.*

There are two activities under consideration. First, Mr. Del Gallo sought to gather signatures by requesting the signature on

postal property and having people sign the petition for ballot access *while also on postal property.* But when Mr. Del Gallo was

told that he could not do this, he sought permission to *ask for the signature on postal property, but direct that person to the city*

*owned sidewalk on Fenn Street.* To this, Mr. Del Gallo was told that he also would not be allowed to participate in such

behavior. The United States Post Office has made representations to Federal Appellate Courts that it would not apply the

6

regulation to request for signatures wherein the signature was to be performed off postal property as can be seen from a quote

from one case:

The Postal Service said that: (1) it would not apply § 232.1(h)(1) to public perimeter sidewalks that are indistinguishable from their non-postal counterparts; and (2) where the regulation's ban on soliciting signatures remained applicable, *it would limit the ban to the actual collection of signatures on postal property and not apply it where a petitioner merely asks people to sign at off-premises locations.* See Motions Hr'g Tr. at 29, 32-34 (Sept. 24, 2002).

*Initiative & Referendum Inst. v. United States Postal Serv.*, 417 F.3d 1299, 368 U.S. App. D.C. 50 (D.C. Cir. 2005). Of course,

in the instant case, Mr. Del Gallo was not allowed to direct people to Mr. Robbins-Zust, who was located on the sidewalk

belonging to the City of Pittsfield on Fenn Street. POSTAL BULLETIN 22119, at 19 (Jan. 8, 2004) made the follow limitations:

Thus, if a petition circulator wishes to collect signatures for a petition, poll, or survey, *he or she would not be prohibited from standing on exterior parts of Postal Service property that are open to the public and passing out informational leaflets, holding up a sign, or both. The leaflet or sign could provide relevant information about the petition, poll, or survey, and direct Postal Service customers to nearby non-Postal Service property, that is, property not under the Postal Service's charge and control, where they can sign the petition, poll, or survey, if they so desire.*

*Initiative & Referendum Inst. v. United States Postal Serv.*, 417 F.3d 1299, 1304-1305, 368 U.S. App. D.C. 50 (D.C. Cir. 2005).

While Mr. Del Gallo wanted to (and still wants) to gather signatures on postal property, his second request of asking on postal

property and directing those willing to sign off of postal property does not appear to be proscribed even under the regulation.

**ISSUE 2:** Whether the applicable postal regulation is a content-based restriction or whether it is a content neutral time-place-

manner restriction?: ***The Postal Regulation in question is a content-based restriction based upon subject matter***

***because it excludes an entire category of speech, even if viewpoint neutral.***

After *United States v. Kokinda*, 497 U.S. 720, 759 (1990) was decided, *Burson v. Freeman*, 504 U.S. 191 (1992),

[applying such cases as *Consolidated Edison Co. of N. Y. v. Public Service Comm'n of N. Y.*, 447 U.S. 530, (1980), *Simon &

Schuster, Inc. v. Members of N. Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991)], made it perfectly clear that simply

because a law or regulation is viewpoint neutral *does not mean that is it is not content-based.* If a regulation outlaws some

*categories of speech* but bans others, one still has to examine the content of the speech to determine if the regulation is

7

applicable, rather than simply examine the time, place or manner indifferent to the content of the speech—the fact that regulation is viewpoint neutral within that banned category of speech does not save it from this fact.

In *Longo v. United States Postal Serv.*, 953 F.2d 790 (2d Cir. January 13 1992)(*Longo 2*), it was ruled, in contravention to the finding of the district court (*Longo 1*), that the postal regulation in question was content-neutral. In *Longo*, a candidate was seeking signatures for office on the postal sidewalk and was not collecting the signatures on the city sidewalk, as in the instant case. The district court (*Longo* 1) had ruled that the regulation was content-based. *Longo v. United States Postal Service*, 761 F. Supp. 220, 230 (1991). The *Longo 2* Court rejected the *Longo 1* court's assertion that the regulation was content-based. The *Longo 2 Court* stated, causing the Supreme Court to review and vacate, "*Although the regulation thus is content-based, when the term 'content' is given its most inclusive construction*, the blanket prohibition against campaigning does not reflect an attempt by the government *to select the subjects* that may be discussed publicly." *Longo 2*, 953 F.2d 790, 797 (2d Cir. 1992) (emphasis added). The *Longo 2* court, incorrectly, having concluded the regulation was not content-based, applied the test for content-neutral time, place and manner regulations. In *Longo v. United States Postal Serv.*, 506 U.S. 802 (1992), it was ruled, "The petition for a writ of certiorari is granted. The judgment is vacated and the case is remanded to the United States Court of Appeals for the Second Circuit for further consideration in light of *Burson v. Freeman*, 504 U.S. 191 (1992)." The *Longo 3* court ruled, in light of being overruled by the United States Supreme Court, "the regulation involved in this case no longer can be found content-neutral." *Longo 3*, 983 F.2d 9, 12 (2d Cir. 1992).

**ISSUE 3:** Whether the sidewalk at the Pittsfield Post Office is a quasi-public forum subject to strict scrutiny review because it has been opened to so many speakers, or a nonpublic forum subject to only a reasonableness review?: *While there is a dividing line between whether the government has merely allowed a select group of a few speakers (so as to preserve the private nature of the forum) or whether the government has opened up the forum to a sufficient number of speakers that it has become a limited or quasi-public forum (so as to make it equivalent to a public forum), in this particular case, the government has opened the forum up to so many speakers and speech that it cannot possibly palm off such widespread permissive use as "limited, selective access" and still claim it is a private forum.*

Even if a forum is not a *traditional* forum such as city sidewalk or *Grace* sidewalk, the government may have opened (the otherwise nonpublic) forum to such a wide variety of speakers that it becomes a *quasi-public* forum. The quasi-public forum is treated in the same manner as a traditional public forum. "The line between limited public forums and nonpublic forums may blur at the edges, and is really more in the nature of a continuum than a definite demarcation." *Cornelius v. NAACP Legal, Defense & Ed. Fund, Inc.*, 473 U.S. 788, 806 (1985)(Blackman dissenting). Some have used the term "designated public forum" for "quasi-public forum." The act of designating something as a public forum is not the government sticking a flag in the ground and declaring it a public forum—so too, the act of designating something as a non-public forum is not the government sticking a flag in the ground and declaring that it is closed public forum, when in reality it has opened the forum to a plethora of speakers and it is trying to assail a few categories of speakers that it disfavors. A public forum is created, despite government self-serving protestations that it is not, when there has been sufficiently widespread acquiesce that the government can no longer credibly state that it has not designated the area a public forum. It is obviously tautological to allow the government to declare that because the plaintiff and some other speakers have been excluded, there is a limited non-public forum, and ergo the plaintiff and the few banned speakers should be excluded. This self-serving tautology will not shield the government from a finding that there is a public forum when in reality a wide array of speakers has been given access to the forum. The only way the government can show that there is a non-public forum is not the self-serving declaration of a lack of intent to open the forum to the public, but demonstrable evidence that in reality the forum has been limited to a few select speakers. It is what the government has done, not what it says it has done, that matters.

Does the great amount of permitted speech at the Pittsfield Post office make it a quasi-public forum? In *Kokinda*, the O'Connor plurality *seemed* to say "no," but a careful reading of the O'Connor plurality only shows a *Grace* sidewalk analysis— *not a quasi-public forum analysis*. There was no discussion regarding the lack of permitted speech. Four judges (Brennan concurrence) ruled that postal sidewalk was a quasi-public forum. What of the ninth justice? Justice Kennedy said, "but there remains a powerful argument that, **because of the wide range of activities that the Government permits to take place on this postal sidewalk**, it is more than a nonpublic forum." *Kokinda*, 497 U.S. at 737. It is very clear that in *Kokinda*, five out of the nine justices considered an interior postal sidewalk a public forum, and nine of the nine justices considered a multi-purpose sidewalk that serves also as thoroughfare a traditional public forum under *Grace*. The only reason that Justice Kennedy did not

9

say that that the sidewalk was a public forum was because he thought it to be a valid content-neutral time, place, and manner restriction, which is clearly no longer good law pursuant to *Longo v. United States Postal Serv.*, 506 U.S. 802 (1992). (Even in purely public forums, content-neutral time-place-manner restrictions are subject to a lower threshold of review.)

Nonetheless, this is not the case of the Pittsfield Post Office allowing a few select speakers on their property. As stated in the fact section, anyone can come down to the Pittsfield Post Office, have a protest, a puppet show, play a guitar, show a movie, play a TV (perhaps some relevance to a political subject), engage in street theater, perform a magic trick, leaflet, talk politics, talk religion, make a speech, say hello, and say just about anything they want to, so long as they do not impede pedestrian traffic or speak too loud. They can even be offensive and controversial. Unlike a teacher's mailbox (*Perry*) or federal fundraiser for non-political non-profits (*Cornelius v. NAACP Legal Defense & Ed. Fund*, 473 U.S. 788 (1985)(a 4-3 decision, 2 justices abstaining), not a single member of the general public is denied access at the Pittsfield Post Office. As can be seen in the facts section, the types of speech permitted are limited only the imagination's ability to imagine. As to who may be able to speak, if you get to the post office, you're on the "in" list, no prior permission required. For the overwhelming majority of permitted speech, no advance permission is required.

As much as the government would like to argue otherwise, just because *some* speech is *proscribed* does not transmogrify an otherwise quasi-public forum into a nonpublic forum under a theory that there was only selective access. It is only when *some* speech is *permitted* that nonpublic claim may be advanced. There is a mighty difference between allowing a few speakers on a military base where the public is generally not permitted to speak, and banning a few speakers on a public post office where the public is generally allowed to speak. The law is not clear where that fuzzy line between the "selective access" of a limited forum has ended and "general access" has begun, but this line was crossed by the Post Office with miles of distance to spare.

While electioneering or signature gathering appears banned, there is otherwise little verboten subject matter—one can speak and handout literature on any political issue, religious issue, and social issue. One can even be offensive, crass, tasteless, and brutally insensitive. Apart from loudness or impeding traffic, almost any modality of expression is permitted. This case is light years away from the limited access of a few charitable agencies for kids and an accepted teachers' union in *Perry*.

10

"Carried its logical conclusion, [the "mere selective access" theory] would make nearly all restrictions on speech self-justifying, since the very fact that the government had denied the plaintiff access could invoke to prove that the government never intended to create a public forum." Tribe, American Constitutional Law §12-24 (2nd ed.) p. 996. There is the air of circular logic in that the question of whether the restricted access is constitutionally permissible (the question) is answered in the negative because there has been restricted access (the very thing being questions). Nothing can survive a circular test when the very object of question becomes the premise for the object's defeat—to call such an inquiry a "test" is chimerical. The real test is not whether speech has been restricted, nor for that matter whether speech *has actually occurred*. If the government put a stage in an otherwise private building and said every one can speak but group x, the fact that the general public declined the invite would not make it a non-public forum. The real test is whether the range of *speech actually permitted* is so expansive that the argument that the government intended to maintain the privacy of the forum is no longer credible.

There is one reason last reason to consider a postal sidewalk a public forum. The United States Supreme Court would never vacate and remand a case if it served no useful purpose and was moot. For instance, both content-neutral time, place, and manner restrictions and examination of speech in non-public forums are subject to reasonableness inquiry. *See, e.g., Longo 2*, 953 F.2d 790, 794 (2d Cir. 1992) ("Time, place or manner restrictions on expressive activity are constitutional, regardless of the type of forum involved, provided they are reasonable," and "Regulation of speech activity on [nonpublic forum] property must be *reasonable* and not based on the *viewpoint* of the speaker." *Any* regulation that would be a valid time, place, and manner restriction in a public forum would pass the reasonableness inquiry in non-public forums. The question of whether a restriction is content-based or content-neutral is moot in nonpublic forums, so there would never be a reason to remand a case in a non-public forum upon the epiphany that a regulation was content-based after all. Ergo, it would never make sense to remand a putative time-place-manner restriction that was subsequently determined to be content-based *if the speech to be performed was in a non-public forum anyhow*. In *Longo v. United States Postal Serv.*, 506 U.S. 802 (1992) as case was vacated and remanded because the postal regulation was deemed to be content-based. If the Supreme Court thought a postal sidewalk was a private forum, it would never have vacated the case for reexamination *because it would not have made a difference*—in private forums, regulations need only be reasonable, whether they are content-based or not. While the Supreme Court did not explicitly state in *Longo* that the United States Post Office was a public forum, it was highly inferred. In the context

11

of a non-public forum, whether a speech restriction is content-based or content-neutral is moot, and it highly unlikely that the Supreme Court would have remanded *Longo* if the content-based/content-neutral distinction did not affect the outcome of the case.

**ISSUE 4:** Whether, assuming the sidewalk at the Pittsfield Post Office is a public forum (be it traditional or quasi), whether the regulation passes strict scrutiny? *The Postal Regulation does not even remotely come close to passing strict scrutiny because there is nothing remotely arising to a "compelling interest"* (as will be discussed, it is not even a reasonable regulation) *and the regulation could be narrowly tailored by simply outlawing speech that blocks the entranceway to the Post Office or otherwise interferes with postal operations.*

If the forum is a public forum (regardless if whether it is a traditional public forum or quasi-public forum), the review is strict scrutiny. Under strict scrutiny, "[t]he State must show that the regulation is necessary to serve *a compelling state interest* and that it is *narrowly drawn* to achieve that end." *Burson v. Freeman*, 504 U.S. 191, 198 (1992); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Under the compelling interest test, ""[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation." *Sherbert v. Verner,* 374 U.S. 398, 406 (1963). *See generally*, *Thomas v. (Sheriff) Collins*, 323 U.S. 516, 529-533 (Section IV) (1945), for a lengthy discussion of the compelling interest test *and the need to weigh the value of the regulated speech in addition to weighing the government's interest in the regulation.* The First Amendment has an inherent hostility to regulations that are instinct with "collateral damage," so as to terminate some speech that the government has a compelling interest to eradicate, but also needlessly terminating speech that creates no or little offense in the salvo. Under the narrowly tailored test, if less restrictive means are available so as not to proscribe or burden speech that gives no offense, the regulation is void as overly broad. *See, e.g., Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 664 (2004). Suffice it to say, for the reason that the regulation is not even *reasonable*, provided *infra*, there is certainly no compelling interest. The *Longo 3* court concluded, "While we have held that the state's interest in enacting the regulation involved in the instant case *may be significant*, surviving the exacting scrutiny required for content-neutral time, place, and manner restrictions, *we decline to hold that it is compelling.*" *Longo 3*, 983 F.2d 9, 11 (2d Cir. 1992)(holding the regulation would not survive strict scrutiny).

12

**ISSUE 5:** Whether, assuming *arguendo*, the sidewalk at the Pittsfield Post Office is a nonpublic forum, whether the regulation is reasonable? *The regulation is not reasonable because (1) signature gathering at the Pittsfield Post Office has never been known to cause a problem over decades of practice, (2) the regulation is far to overly broad and could be much narrower to cure the evil, and (3) the Post Office's behavior by permitting speech that has equal or greater potential of disruption indicates the regulation is unreasonable.*

In non-public forums, "in addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, *as long as the regulation on speech is reasonable.*" *Perry,* 460 U.S. at 46 (emphasis supplied) *When a certain type of speech is forbidden but other types of speech are permitted that appear to implicate the same problems and create the same putative evils, series questions arise as to whether the speech regulation is reasonable, even if it was to be conceded that the regulation was both viewpoint-neutral and in a non-public forum.*

> But California and federal courts have invalidated content-based rules as unconstitutional when rules contain exceptions, *and those exceptions implicate the same interests that motivates the restriction on the regulated content. Gilleo,* 512 U.S. [43,] 52 ("Exemptions from an otherwise legitimate regulation of a medium of speech may be noteworthy for a reason quite apart from the risks of viewpoint and content discrimination: **They may diminish the credibility of the government's rationale for restricting speech in the first place.**"). In *Press Communications,* for example, the California Court of Appeal invalidated a city ordinance prohibiting the distribution of certain commercial and campaign material to private homes. The court held that the city's justifications for the rule--preventing crime and litter--was invalid because the ordinance did not restrict other literature which was equally likely to contribute to the same problems of crime and litter. *Press Communications,* 31 Cal.App.4th at 42 "Reliance upon this abstractly content-neutral interest presumes [the restricted commercial speech] contribute to these problems while other categories of written materials do not. The City offered no evidence to establish such a presumption."). *See also Discovery Network,* 507 U.S. at 429 (holding city ordinance barring the display of commercial material, but not non-commercial material, from news racks unconstitutional because both commercial and noncommercial publications are equally responsible for the city's safety concerns and visual blight); *Carey v. Brown,* 447 U.S. 455, 65 L. Ed. 2d 263, 100 S. Ct. 2286 (1980) (finding unconstitutional Illinois law permitting labor picketing but restricting non-labor picketing because both forms of picketing involve the same concerns of privacy intrusion); *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 33 L. Ed. 2d 212, 92 S. Ct. 2286 (1972) (invalidating Chicago ordinance under the First Amendment because it prohibited non-labor picketing while allowing labor picketing near schools because both forms of picketing are equally prone to incite violence, which was Chicago's stated concern in enacting the restriction).

*Glendale Associates v. National Labor Board,* 347 F.3d 1145, 1155 (2003)(emphasis added). The argument that the so-called evils of Mr. Del Gallo gathering signatures for ballot access without a table or chair on the exterior of the Post Office, while permitting the more obtrusive conduct of voter registration strongly indicates the putative evil is grossly being overstated

and the regulation unreasonable. Clearly it cannot create more of an obstruction to traffic flow—much more information is required in voter registration, the use of tables and chairs is permitted in voter registration,[4] and the voter registration can take place in the interior areas.[5] The argument that Mr. Del Gallo would be mistaken as "sponsored" by the United States Post Office is comic—the general public knows that the federal government does not endorse candidates, and nobody in the decades long history of the Pittsfield Post Office ever thought a signature gatherer for ballot access was sponsored by the Post Office. Moreover, this confusion of sponsorship theory could be advanced in *any* dispute over public forums, and it has seldom if ever been given weight. There would be far greater concern that the Post Office is sponsoring one side of the issue any number of controversial issues which are allowed to be protested there, but that has not stop the Post Office from permitting the behavior.

Many times has the government argued that a forum is a non-public forum, only to ultimately lose, because the regulation was not reasonable. Many have criticized The *Perry* decision for seriously eroding the First Amendment by allowing content-based regulation to be subject to a substantially lower level of protection (reasonableness) even in public places where one has a right to be. But the First Amendment is making a comeback—the "reasonableness test" is beginning to have some bite to it in the case law, and may even restore First Amendment jurisprudence to its full glory of the days of yore, prior to *Perry*. Prior to *Perry*, the general rule was that one could say whatever they wanted to say, so long as they did not disrupt the purpose of the forum so that others could not use it for what it was meant for. "One who is rightfully on a street which the state has left open to the public carries with him as elsewhere the constitutional right to express his views in an orderly fashion." *Jamison* v. *Texas*, 318 U.S. 413, 416 (1943). In *Kokinda*, while Justice Brennan critiqued the O'Connor plurality as giving little weight to *Jamison*, 497 U.S at 743-744, subsequent United States Supreme Court decisions have clearly reinstated the law and values of *Jamison*, and have maintained that "reasonable" determinations will only be upheld if needed to preserve order, maintain the purpose of the forum, and if not written in such an overbroad manner as to exclude speech that does not give offense. Thus, "reasonableness" review in non-public forum offers much greater protection than mere rational basis review, where any proffered reason that is not illogical will suffice.

---

[4] The inability to use chairs or tables forms no part of this lawsuit.
[5] Mr. Del Gallo neither seeks nor complains that he was not allowed in the interior areas.

14

It is worth reviewing the *Kokinda* case again. In *Kokinda*, the O'Connor plurality said the regulation banning solicitation was "reasonable," declining to hold it a public forum. Members of the National Democratic Policy Committee wanted to "solicit contributions, sell books and subscriptions to the organization's newspaper, and distribute literature addressing a variety of political issues." *Kokinda*, 497 U.S. at 723. The *Kokinda* court had to determine whether the ban on soliciting alms and contributions violated the First Amendment. *Kokinda*, 497 U.S. at 722—723. Perhaps weighing into the reasonableness determination, "40 and 50 complaints regarding their presence." *Kokinda*, 497 U.S. at 723. By contrast, at the Pittsfield Post Office, there has almost never been a complaint about the practice of gathering signatures.[6]

Of course, *Kokinda* was a split decision and the Kennedy concurrence was the narrowest grounds upon which the case was decided, and is the opinion that enjoys has precedential effect. Justice Kennedy, holding that the postal sidewalk was probably a public forum, did a reasonableness analysis, albeit in the content of a time, place, or manner regulation. Justice Kennedy said that he though the regulation was acceptable because so much other speech was permitted, and that it "permits respondents to engage in a broad range of activity to express their views, including the solicitation of financial support." *Kokinda*, 497 U.S. at 739. Using a balancing approach, Justice Kennedy would have thought the simple, and politically important act of getting a signature (far more important than a mere mercantile exchange), would have enjoyed First Amendment protection because it creates less disturbance than hawking items. Justice Brennan, Marshall, and Stevens all thought the regulation were unreasonable and not narrowly tailored.[7] Justice Brennan, as this brief does in the facts section, showed that the wide variety of permitted speech not only showed that the forum was open, *but that the regulation was unreasonable.* Justice Brennan, in *Kokinda*, offered excellent reasons why the regulation was not reasonable.

> Even if I did not believe that the sidewalk outside the Bowie Post Office was a public forum, I nevertheless could not agree with the plurality that the postal regulation at issue today is reasonable as applied to respondents. The Postal Service does not subject to the same categorical prohibition many other types of speech presenting the same risk of disruption as solicitation, such as soapbox oratory, pamphleteering, distributing literature for free, or even flag-burning. A solicitor who asks for funds and offers literature for sale

---

[6] The O'Connor plurality seemed willing to accept any parade of horribles offered by the Post Office without a scrutinizing eye.

[7] The behavior that is the subject of this case was legal when *Kokinda* was decided. Cf. *Kokinda*, 497 U.S. at 761 ("Indeed, the Postal Service permits other types of speech that demand an immediate response from the listener, such as inviting passers-by to sign a petition to place an initiative proposal on the ballot.") "Until relatively recently, Postal Service regulations were silent on the subject of soliciting petition signatures on postal premises, while a 1992 postal bulletin expressly permitted "issue-oriented petitioning [and] campaigning for a referendum or ballot initiative." *Initiative & Referendum Inst. v. United States Postal Serv.*, 417 F.3d 1299, 1302 (Fed. Court of Appeals D.C. Cir. 2005) (D.C. Cir. 2005) The regulation banning signature gathering on petitions was passed in 1998. *Id.*

outside the entrance to a post office is no more likely to block access than is a leafleteer who stands in the same place or a speaker who sets up his soapbox there. In fact, solicitors may be quite unlikely to attract much of an audience, because public requests for money are often ignored. Certainly, solicitors are less likely to draw a crowd, and thus to disrupt postal functions, than are eloquent orators or persons distributing popular magazines for free. Under the regulation, a group may stage a political rally to call attention to the problem of drug abuse and draw hundreds or even thousands of persons to the area just outside the entrance to the post office, because there is no general prohibition on large gatherings on postal premises. But since there is a categorical ban on solicitation, the group would be unable to ask a single member of the public for a contribution to advance its cause.

*This inconsistent treatment renders the prohibition on solicitation unreasonable.* The Postal Service undeniably has a legitimate interest in avoiding disruption of its postal facilities and ensuring that its buildings remain accessible to the public. But the Government interest in preventing disruption of post office business or harassment of postal patrons is addressed by the direct prohibitions on such conduct in existing postal rules, and the Service has not explained satisfactorily why these provisions are inadequate to deal with any disruption caused by solicitation.

The plurality suggests that the irksome nature of solicitation supports the reasonableness of the postal regulation. Even were the Postal Service's desire to prevent the annoyance of customers a legitimate basis for regulation, such an interest could not justify the blanket ban on solicitation alone. Many expressive activities permitted by § 232.1(h)(1) likely would trigger the same reactions in the audience. Pamphleteers might distribute embarrassing or disturbing handbills, and soapbox orators might shout caustic invectives at postal patrons as they walk past, yet those activities are not subject to a categorical prohibition.

*Kokinda*, 497 U.S. at 759-762. After *Kokinda* was decided, came the case of *International Society for Krishna Consciousness v. Lee*, 505 U.S. 672 (1992), and the companion case with the names reversed, *Lee v. Society for Krishna Consciousness,* 505 U.S. 830 (1992), the short majority per curium decision upheld the appellate court which ruled that the ban on the distribution of literature violated the First Amendment.

Justice O'Connor waxed on eloquently regarding what constitutes "reasonable." "The reasonableness of the Government's restriction [on speech in a nonpublic forum] must be assessed in light of the purpose of the forum and all the surrounding circumstances." *International Society for Krishna Consciousness v. Lee,* 505 U.S. at 682 (1992). *See also* Judge Kennedy's opinion, 505 U.S. at 693-694, joining the many judges who hold the developed public forum analysis in low regard. In *Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.,* 482 U.S. 569 (1987), the United States Supreme Court *unanimously* struck down a regulation that prohibited "all First Amendment activities" in the Los Angeles International Airport without even reaching the question whether airports were public fora, because cutting such a broad swath was unreasonable in a non-public forum.

While in theory people have to stop to gather a signature, it is but a short-lived stop, most people think everyone "has a right to run," and most people do not engage in extensive discussing of the issues. Were a signature gatherer to habitually

engage in extended debate or discussion, as a practical matter, it would not leave enough time to gather signatures. The practical experience of Mr. Del Gallo, who himself gathered signatures for many days in front of the Pittsfield Post Office, and that of the numerous other candidates for office over the past decades, offers a real world experience proof that the practice is compatible with the use of the Post Office and will not cause significant (if any) interruptions. "The Supreme Court has repeatedly held absolute bans on pamphleteering and canvassing invalid, whether applied to nonpublic governmental forums or to private property, because of their substantial overbreadth." *Initiative & Referendum v. U.S. Postal Serv.*, 417 F.3d 1299, 1315 (D.C. Cir. 2005); *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 160, (2002) (noting that "[f]or over 50 years, the Court has invalidated restrictions on door-to-door canvassing and pamphleteering"). Like leafleting and canvassing, signature gathering for elected office is seldom incompatible with the use of the premises. In *Initiative & Referendum v. U.S. Postal Serv.*, the court completely rejected the ban on signature gathering as reasonable:

> The Postal Service has advanced a significant, content-neutral interest in support of its ban on the solicitation of signatures on petitions. In explaining its rationale for amending §232.1(h)(1), the Postal Service stated that it wanted to minimize the disruption of postal business and to provide unimpeded ingress and egress of customers and employees to and from post offices. 62 Fed.Reg. 61,481, 61,481 (Nov. 18, 1997). The Supreme Court has repeatedly found this kind of government interest sufficient to satisfy the significance and content-neutrality elements of the time, place, or manner test.
>
> But while the government's interest is sufficient, §232.1(h)(1) is not narrowly tailored to effectuate it. To be narrowly tailored, a regulation need not be the least restrictive or least intrusive means of serving the government's interests. *Nonetheless, it must not burden substantially more speech than is necessary to further the government's legitimate interests.[8]* A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy. *A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil.*
>
> The Postal Service does not suggest that all signature-gatherers engage in harassment of postal customers. Appellee's Br. at 46. It contends only that the *potential* exists and, in fact, *occasionally* does occur. *Id.* (emphasis added). As the government explained in its memorandum to the district court, the Postal Service argues that the restrictions target precisely the conduct that impinges on the significant government interests sought to be advanced, *i.e.*, signature-gathering activities that interfere with customer satisfaction by being, *at times*, disruptive, that *occasionally* give the appearance of bias or partiality on the part of [the Postal Service], and that *at times* require postal employees to spend too much of their time on nonpostal business. Def.'s Stmt. Mat. Facts at 36 (emphasis added). There is no evidence, the government insists, that the regulation restricting signature-gathering activities on exterior postal property does not serve these legitimate interests. *Id.*
>
> We agree that the regulation serves the government's legitimate interests. But it surely does not, in the government's words, target those interests precisely. To the contrary, since the problems the government

---

[8] To mix metaphors, under reasonableness review in non-public forums, one probably can go hunting for deer using bear shot for slight overkill. But one cannot shoot flies with cannons. The regulation need not be *perfectly* narrowly tailored—but it cannot unnecessarily burden a substantial amount of speech for which the government has no interest in eradicating.

17

identifies arise only occasionally and at times, the across-the-board ban on signature solicitation. Necessarily bars much solicitation that is not disruptive, does not give the appearance of partiality on the part of the Postal Service, and does not require excessive postal worker time. Thus, a "substantial portion of the burden on speech does not serve to advance" the government's content-neutral goals.

*Initiative & Referendum v. U.S. Postal Serv.,* 417 F.3d 1299, 1307–1308 (D.C. Cir. 2005)(internal citations omitted). Mr. Del Gallo knows of no complications from signature gathering, and the Post Office has previously briefed that such problems are infrequent and sporadic—in Pittsfield, after decades of the practice, there has been almost no known problems.

**ISSUE 6:** Whether there is an equal protection violation? **The postal regulation is inconsistent with the Equal Protection Clause.**

When some types of speakers are allowed to speak, but other types of speakers are proscribed when they want to engage in similar or even less obtrusive speech than the protected class, serious issue of equal protection violations arise. See e.g., *Police Department Of Chicago v. Mosley,* 408 U.S. 92, 94-95 (1972)(holding, "Because Chicago treats some picketing differently from others, we analyze this ordinance in terms of the Equal Protection Clause of the Fourteenth Amendment.) See also, *Carey v. Brown,* 447 U.S. 445, 462 (1980) (holding, "Yet here, under the guise of preserving residential privacy, Illinois has flatly prohibited all non-labor picketing even though it permits labor picketing that is equally likely to intrude on the tranquility of the home.") The unequal treatment between the class of people seeking ballot access versus the class of people that want to register voters/engage in protest/engage in a myriad of types of speech activity, constitutes a type of discrimination that denies equal protection of the law under the 14th Amendment of the United States Constitution.

As some commentators have suggested, there may be even a fourth category of speech, the "limited" public forum. The limited public forum, this "4th category," is believed to be somewhere below a quasi-public forum that has been opened up for general expressive activity, but above the completely closed public forum. In limited public forums, there may be a right of "like speakers" to have access, where there were a few groups of a like nature allowed to speak, but the extreme limits on the quantum of speakers and variation of permitted speakers did not compel a conclusion that the forum was a quasi-public forum. *Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45 (1983), is instructive—in that case *one* private school union was allowed to use the school mailboxes while the other was excluded. Also stated in *Perry,* "We can only conclude that the

18

schools do allow *some* outside organizations such as the YMCA, Cub Scouts, and other civic and church organizations to use the facilities." *Perry Ed. Assn.*, 460 U.S. at 47. The *Perry* court then added, "Moreover, even if we assume that by granting access to the Cub Scouts, YMCA's, and parochial schools, the School District has created a 'limited' public forum, *the constitutional right of access would in any event extend only to other entities of similar character*. While the school mail facilities thus might be a forum generally open for use by the Girl Scouts, the local boys' club, *and other organizations that engage in activities of interest and educational relevance to students*, they would not as a consequence be open to an organization such as PLEA, which is concerned with the terms and conditions of teacher employment." *Perry Ed. Assn.*, 460 U.S. at 47. Under this theory, youth oriented groups such as the Catholic Youth Center, 4-H, the Campfire Girls, or Junior Achievement could not be denied similar access already provided to the other youth-oriented groups, but the Democratic Party or a competing teachers union could be. In limited forums there is a constitutional obligation to allow "like" speakers, so as not to offend the equal protection clause. For example, the fact that the Government occasionally may invite a speaker to a military base to lecture on drug abuse does not support the inference that it would be compatible with the purposes of the base to provide a forum for all speakers, or even for all those who wish to speak on drug abuse. *Greer* v. *Spock*, 424 U.S. 828 (1976). "But if the base sponsored a drug abuse prevention day, and invited many organizations to set up displays or information booths, the claim of a similar, uninvited group that the Government had established a limited public forum would be on much firmer ground." *Cornelius v. NAACP Legal Defense & Ed. Fund*, 473 U.S. 788, 820 (1985) (Blackmun dissent).

Some cases refer to the limited public forum as a species of the quasi (or designated) public forum, less extensive in protection that unlimited forums in quasi or designated public forums. *International Soc. for Krishna Consciousness v. Lee*, 505 U.S. 672, 678 (1992). Thus, the four categories of forums, falling on the spectrum from the most protection to least protection would be (1) traditional public forums (parks, city sidewalks, *Grace* sidewalks) (2) unlimited quasi-public forums (3) limited public forums, and (4) closed forums. Thus, it may be somewhat erroneous to speak of a "tripartite" forum analysis. As can be imagined, these categories are broad areas on a spectrum, rather than discrete categories. If there be only one or two speakers, it remains a closed forum. Open it up to three or four speakers within a certain category, there is a limited public forum where similarly situated speech must be permitted, but dissimilar speech need not. Open the forum up to enough speakers, especially if of wide variation though not a strict requirement, one has an unlimited quasi-public forum even if the

19

government chooses a few categories of speech for regulation or proscription—too much has been allowed to consider it a mere limited public forum. The ban on similar speech in limited forums raises not only equal protection concerns, but as in unlimited quasi-public forums, raises the specter that the regulation may not be reasonable after all since so much speech that would visit similar alleged evils is still allowed to occur.

So too, since voter registration is permissible, there is a "limited public forum," which requires Mr. Del Gallo to be able to engage *in similar conduct and expression* under the Equal Protection clause since his behavior is similar in nature, and frankly, much less likely to create the evils the regulation claims needs amelioration as compared to voter registration.

**CONCLUSION:** As to directing people to the Pittsfield city sidewalk where the signatures are to be gathered, such activity did not fall within the postal regulation ban pursuant to admissions in previous cases and pursuant to postal bulletins. The multi-purpose, thoroughfare that is the Pittsfield Postal sidewalk is a traditional forum in the form of a *Grace* sidewalk. Because there are virtually no limits to type of speech or who can speak, the exterior sidewalk is an unlimited quasi-public forum. Even were the forum to be considered private forum, the regulation is not reasonable in light of the real world experience of the decades of gathering signatures at the Pittsfield Post Office, the amount of speech clearly more offensive and more obtrusive currently permitted, and the Post Office's frank admission in other cases that the problems have been very infrequent and few. Moreover, the regulation is unreasonably overbroad because the purpose of the forum may be preserved without banning the 99.999999% of all signature gathering that is not going to cause a problem—just ban impeding traffic. The regulation is ultra-vires because nothing gives the US Postal Service the power to limit speech and nullify state constitutional rights of free expression, and were some general grant of authority to be read as providing such authority, the grant is so standardless and vague that there would be an unconstitutional transfers of the delegation powers.

Rinaldo Del Gallo, III                    March 06, 2007
*Pro se*
100 North Street
Suite 404
Pittsfield, MA 01201
(413) 445-6789